## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Pittsfield Development LLC, et al.,

        Plaintiffs,

v.

The Travelers Indemnity Company,

        Defendant.

No. 18 CV 06576

Honorable Nancy L. Maldonado

## MEMORANDUM OPINION AND ORDER

This insurance coverage dispute arises from a pipe burst in the historic Pittsfield Building in downtown Chicago. On December 17, 2016, two pipes burst on the tenth floor of the Pittsfield Building, causing water damage to the first ten floors. Plaintiffs are three related entities that are the owners of those damaged floors: Pittsfield Development, LLC ("Pittsfield Development"), Pittsfield Residential II, LLC ("Pittsfield Residential"), and Pittsfield Hotel Holdings, LLC ("Pittsfield Hotel") (collectively "Plaintiffs" or the "Pittsfield Entities"). After the loss event, the Pittsfield Entities filed a claim for the damage with their insurer, The Travelers Indemnity Company ("Travelers"). The two sides disputed the extent and cost of the damage, and Travelers ultimately paid out approximately $300,000 for the claim, far less than what the Pittsfield Entities were seeking.

Unable to resolve their disagreement, the Pittsfield Entities initiated the instant breach of contract suit in September 2018, alleging that Travelers failed to pay the full amount of the covered loss, which they contend is more than $8 million. The Pittsfield Entities separately assert a claim of reformation of contract to correct the omission of the Pittsfield Hotel entity as a named insured in the Travelers policy. After initial motion practice and discovery, Travelers filed an amended

answer in June 2020 to assert a counterclaim for breach of contract. In its counterclaim, Travelers asserts that the Pittsfield Entities intentionally misrepresented their alleged damages by more than $1.1 million, and that the misrepresentation renders the policy void.

Pending before the Court now are the parties' cross-motions for summary judgment. Travelers seeks summary judgment in its favor on all claims, including its counterclaim for breach of contract and the Pittsfield Entities' claims for breach of contract and reformation. (Dkt. 160.)[1] The Pittsfield Entities have filed two partial motions for summary judgment: one for judgment in their favor on their claim for reformation, (Dkt. 151) and one for judgment in their favor on Travelers' counterclaim. (Dkt. 156.) For the reasons stated in this Opinion and Order, Travelers' motion for summary judgment is granted in full and the Pittsfield Entities' motions are denied. In short, the Court concludes that the Pittsfield Entities violated the terms of the insurance policy by materially misrepresenting the extent of their damages. Travelers is therefore entitled to summary judgment in its favor on its counterclaim as a matter of law, which also requires judgment in its favor on both of the Pittsfield Entities' claims. Travelers is awarded damages in the amount of $301,537.95, plus interest and costs.

## Background

Because this case is before the Court on summary judgment, the factual record is framed largely by the parties' Local Rule 56.1 statements and responses, although the Court retains discretion to "consider other materials in the record" where appropriate. Fed. R. Civ. P. 56(c)(3). Except as otherwise noted, the below background represents the undisputed facts based on the Local Rule 56.1 statements and responses.[2] Where the parties have properly disputed a fact, the

---

[1] In citations to the record, page numbers are taken from CM/ECF headers, except for deposition transcripts, for which the Court cites the transcript's internal page and line number.

[2] The Court cites in particular the responsive Local Rule 56.1 statements submitted with respect to Travelers' motion for summary judgment (Dkts. 167, 184) and the Pittsfield Entities' partial motion for summary judgment on

Court will set forth each side's position. The Court notes that it has included only the background facts that are necessary to provide context for the Court's decision on Travelers' counterclaim, given that judgment on the counterclaim also disposes of the Pittsfield Entities' claims in this suit.

### A. The Parties and the Insurance Policy

Plaintiffs Pittsfield Development, Pittsfield Hotel, and Pittsfield Residential are each Illinois limited liability companies with their principal places of business in Miami Beach, Florida. (Dkt. 167 ¶ 2.) Pittsfield Development originally purchased the Pittsfield Building, a forty-story historic building in downtown Chicago, in July 2000. (*See* Dkt. 174 ¶ 7.) Over the years since 2000, Pittsfield Development conveyed various sets of floors in the building to different entities, including the two other Pittsfield Entities named as Plaintiffs here. At the time of the loss event in December 2016 that is the subject of this lawsuit, Pittsfield Development owned the ground floor, basement, and sub-basement levels of the building, as well as a part of the upper section of the building that included a portion of floor 22, and floors 23 through 40; Pittsfield Hotel owned floors 2 through 9; and Pittsfield Residential owned floors 10 through 12. (Dkt. 176 ¶¶ 1, 2–3.) At all relevant times, Robert Danial acted as the sole managing member of the Pittsfield Entities with authority to direct the activities of all three entities. (*See* Dkt. 167 ¶ 5; Dkt. 176 ¶ 12.)

Travelers is an insurance company organized under the laws of Connecticut with its principal place of business in Hartford, Connecticut. (Dkt. 167 ¶ 1.) Travelers issued a commercial property insurance policy for the building to Pittsfield Development and Pittsfield Residential with a policy period of July 10, 2016, to July 10, 2017 (hereafter "the Policy"). (Dkt. 176 ¶ 8.) The Policy included Pittsfield Development and Pittsfield Residential as named insureds, as well as a

---

Travelers' Counterclaim (Dkt. 176, Dkt. 182), where the asserted fact and response are contained in the same document. The Court has occasionally relied on facts in the Local Rule 56.1 statements for the other motion for summary judgment with respect to the Pittsfield Entities' claim for reformation, (*see* Dkt. 174), though the majority of the information in those filing is superfluous based on the Court's disposition of the other motions.

"Pittsfield Building, LLC," though Plaintiffs maintain that was a mistake as there is no such entity as "Pittsfield Building, LLC," and that Pittsfield Hotel instead should have been an additional named insured. (*See id.* ¶ 10; Dkt. 167 ¶ 3; Dkt. 174 ¶ 52.)

Relevant here, the Policy contains the following provision rendering it void in the event of fraud or misrepresentation:

> (F) Concealment, Misrepresentation, or Fraud
> . . .
> 2. This policy is void if the Insured or any other person or entity insured under this policy, at any time subsequent to the issuance of this insurance, commits fraud or intentionally conceals or misrepresents a material fact relating to:
>
> a. This policy;
> b. The Covered Property;
> c. The Insured's interest in the Covered Property; or
> d. A claim under this policy.

(Dkt. 167 ¶ 43; *See* Dkt. 161-2 at 80.)

### B. The Water Loss Event and the Pittsfield Entities' Insurance Claim

On December 17, 2016, two pipes burst on the tenth floor of the Pittsfield Building, causing water damage to the first ten floors. (Dkt. 167 ¶ 6.) The Pittsfield Entities immediately secured the services of a restoration contractor, ServiceMaster, to dry out the building, which was done over the course of several days following the incident. (*Id.* ¶ 7.) The Pittsfield Entities separately retained the services of Spartan Contractors and Otis Elevators to perform additional water remediation work. (*Id.*) Shortly after the incident, the Pittsfield Entities reported the loss event to Travelers, which retained its own building consultant and licensed contractor to assist Travelers in evaluating the loss. (*Id.* ¶ 8.)

While Travelers was in the process of preparing its estimate of the damages, the Pittsfield Entities separately hired Joseph Sabbagh, a licensed public adjuster of Maximum Insurance Adjusters, Inc, to assist the Pittsfield Entities with submitting their claim and preparing their own

estimate. (*Id.* ¶¶ 6, 8–9; Dkt. 176 ¶¶ 13, 15.) Sabbagh inspected the damage at the Pittsfield Building on June 12, 2017, spending about five hours at the property, and then used a computer program called "Xactimate" to draft an estimate of the damages at the property caused by the pipe burst six months prior. (Dkt. 167 ¶ 10; Dkt. 176 ¶¶ 16–17.) Sabbagh's estimate included more than 900-line items identifying work that, in his opinion, might be needed to repair the damage caused by the water event six months earlier. (Dkt. 167 ¶¶ 11, 26.) Sabbagh provided both a replacement cost value (RCV) estimate, that is, the cost to repair or replace the damaged property, as well as an "actual cash value" (ACV) estimate, which is the repair and replacement cost less a deduction for depreciation based on the age and condition of the building. (*See, e.g.*, Dkt. 167 ¶ 11, 54, 58.) Sabbagh estimated the total ACV of the repair and replacement work caused by the water damage at $8,593,200.40. (Dkt. 167 ¶ 11.)

Of particular relevance here, Sabbagh's estimate includes as a line-item a "Bid Item from Bluestone Environmental" for "Lead Paint & Asbestos Removal." (*Id.* ¶¶ 26–27.) Sabbagh's estimate lists this "Bid Item" at a unit price of $950,000.00, which he combined with an estimated $190,000.00 in "overhead and profit" for an estimated ACV of $1,140,000 (out of the total ACV of $8,593,200.40). (*Id.*) As will be discussed further in the next section below, the parties vigorously dispute the origin and legitimacy of this line item, and questions about its validity form the basis of Travelers' counterclaim for misrepresentation.

Before reaching the specific disputes over that line-item, however, a few more general background facts are necessary. Sabbagh submitted his estimate to Travelers on July 12, 2017, after which representatives of Travelers met with Sabbagh at the property to discuss his estimated damages figures. (*Id.* ¶ 12; Dkt. 176 ¶ 18.) Though Sabbagh identified some additional items of damage that Travelers did not initially include in its own estimates, Travelers disagreed with many

5

(if not most) of Sabbah's opinions about the total damages caused by the December 2016 water loss. (*Id.*). Based on the information from Sabbagh, its own evaluation, and the work the Pittsfield Entities had already performed, Travelers estimated the total loss as a result of the water damage at $401,537.95. (*See* Dkt 162-4 at 100.) After accounting for the $100,000.00 deductible, Travelers ultimately made payments on the claim totaling $301,537.95. (*Id.*; Dkt. 167 ¶ 15.)

With the exception of the work done by ServiceMaster, Spartan Contractors, and Otis Elevator, no further repair work was done to the areas of the property damaged by the water from the pipe burst. (Dkt. 167 ¶ 13.) Nor will any future work be done at the Pittsfield Entities' expense, as they sold their interest in the Pittsfield Building as of August 2017. (*Id.* ¶¶ 14–15; Dkt. 184 ¶ 19.) Though the record is somewhat vague on this point, it appears that the Pittsfield Entities' plans to demolish and renovate a number of the floors in the building to develop a hotel had already stalled prior to the water-loss event in December 2016, due to a zoning dispute with the City of Chicago. (*See* Dkt. 184 ¶ 18.)[3] Unable to complete their intended project, Pittsfield Development filed for bankruptcy in March 2017 and the Pittsfield Building was ultimately sold pursuant to an order of a Bankruptcy Court. (*See id.*; Dkt. 167 ¶ 14; Dkt. 167-2.)

## C. Travelers' Counterclaim and the Disputed Bluestone Environmental Bid Item

The Court turns next to the procedural history of the instant insurance coverage lawsuit and the record evidence that is relevant to Travelers' counterclaim for breach of contract based on misrepresentation.

The Pittsfield Entities initiated the instant lawsuit in September 2018, bringing a sole claim for breach of contract. (Dkt. 1.) In the Complaint, the Pittsfield Entities alleged that Travelers failed

---

[3] The Pittsfield Entities zoning dispute with the City of Chicago is the subject of another lawsuit in this District pending before Judge Kocoras. *See generally Pittsfield Dev., LLC v. City of Chicago*, No. 17 C 1951, 2024 WL 579715 (N.D. Ill. Feb. 13, 2024).

to pay the actual total amount of damages owed under the Policy for the water-loss event, which they contend was $8,592,961.40. (*Id.* ¶ 40.) The Pittsfield Entities subsequently filed a First Amended Complaint (FAC) in December 2018, adding the claim for reformation of contract, and then filed the operative Second Amended Complaint (SAC) in October 2019. (Dkts. 25, 79.) Both amended complaints include the same $8,592,961.40 figure as the "actual amount" the Pittsfield Entities contend they are owed under the Policy, which comes to $8,291.423.45 in damages after accounting for the $301,537.95 that Travelers has already paid. (Dkt. 79 ¶¶ 54–55; Dkt. 167 ¶ 18.)

The SAC also notably includes Sabbagh's estimate as an attached exhibit. (Dkt 79-3.) The estimate lists $8,592,961.40 as the total estimated ACV for the damage caused by the water loss event, which is also pled in the SAC as the purported "actual amount" of the loss owed under the Policy. (*Id.*) The parties do not explain the slight $239 discrepancy between the figure in this Sabbagh estimate attached to the SAC ($8,592,961.40) and the figure in the original Sabbagh estimate that was submitted to Travelers in July 2017 ($8,593,200.40), though based on Sabbagh's deposition testimony it appears the discrepancy was due to a typographical error. (*See* Dkt. 161-11, Sabbagh Dep. Tr. at 155:23.) That typographical error aside, however, the Sabbagh estimate attached to the SAC is the same as the one he initially prepared and submitted to Travelers, and it includes the same $1,140,000.00 line item for lead paint and asbestos removal, based on a purported "Bid Item" from Bluestone Environmental for $950,000.00, plus overhead and profit. (Dkt. 79-3 at 82.) In short, the Pittsfield Entities represented in their pleadings that the Sabbagh estimate reflects their actual damages owed under the Policy, which included the $1,140,000.00 line item for lead paint and asbestos removal.

The Pittsfield Entities confirmed in their February 2020 Rule 30(b)(6) deposition that the Sabbagh estimate formed the basis for their damages owed under the Policy. Danial, sitting as the

Rule 30(b)(6) designee on behalf of the Pittsfield Entities, testified that Sabbagh's estimate formed the basis of the Pittsfield Entities claim for damages in this case, and that he believed it accurately stated the amount they were owed under the Policy, less anything that Travelers had already paid. (*See* Dkt. 167 ¶¶ 21–22.) In particular, Danial testified that the Sabbagh estimate was evidence of how much they were owed, and he went as far as to agree that it "proves [their] loss or damage from [their] point of view." (*Id.*; Dkt 161-6, Danial Dep. Tr. at 214:6–11). Danial similarly testified that it was the Pittsfield Entities' belief that Travelers should have tendered the "total amount stated in the complaint" based on the Sabbagh estimate, and that because Travelers did not tender that amount, they were suing for the difference between what Travelers paid and what is stated in the estimate. (Dkt 161-6, Danial Dep. Tr. at 17:17–18:10.) With respect to the $1,140,000.00 "Bid Item" for asbestos abatement from Bluestone Environmental, Danial confirmed that was included in their purported damages, and when asked whether the Pittsfield Entities had any "particular proof" that the $1.14 million amount was a "real amount of loss," Danial responded that "we have a proposal from a contractor that says it." (Dkt. 167 ¶ 30; Dkt 161-6, Danial Dep. Tr. at 201:12–25.)) Danial separately testified that he did not personally review any bids and relied on Sabbagh to gather the information and present it to Travelers. (*See* Dkt 161-6, Danial Dep. Tr. at 202:1–14.)

Travelers also deposed Sabbagh in February 2020 and questioned him about his estimate and the origination of the Bluestone Environmental "Bid Item" in particular. As previewed above, Travelers disputes much of Sabbagh's testimony with respect to the Bluestone Environmental "Bid Item." The Court will set forth Sabbagh's testimony first, and then Travelers' points of dispute below.[4]

---

[4] The parties repeatedly dispute the other side's reliance on deposition or declaration testimony in their Local Rule 56.1 statements by claiming that the other has omitted context or improperly described or framed testimony. The Court has therefore endeavored to set forth witness testimony directly, or to provide its own summary and paraphrasing without injecting the parties' commentary and descriptions that go beyond the testimony itself. The Pittsfield Entities

With respect to the $950,000.00 line item listed as a "Bid Item" from Bluestone Environmental, Sabbagh testified that this was an oral estimate received over the phone from an employee of Bluestone Environmental, later identified as Tonia Williams. (*See* Dkt. 167 ¶ 31; Dkt.161-11 Sabbagh Dep. Tr. at 151:15–152:6; Dkt 170-2 Sabbagh Dec. ¶¶ 10–12.) As to the origin for this phone call, Sabbagh testified that, sometime after his initial inspection on June 12, 2017, he determined that there might be asbestos in the Pittsfield Building based on its age, as his research showed that buildings constructed around the same time often had a mixture of asbestos in them used as fireproofing. (Dkt.161-11 Sabbagh Dep. Tr. at 151:15–152:6, 262:17–25.) Sabbagh therefore searched for asbestos removal companies online, identified Bluestone Environmental, and called the number listed online. (Dkt.161-11 Sabbagh Dep. Tr. at 254:25–255:8.) According to Sabbagh, he called Bluestone Environmental on July 11, 2017, spoke to a woman, and asked if the company did asbestos work on buildings from the 1920's. (Dkt. 176 ¶¶ 19–20.) The woman said yes, and Sabbagh told her he "might have a client that might need their services," and he proceeded to provide her an approximation of the building's square footage. (*Id.* ¶ 20; Dkt.161-11 Sabbagh Dep. Tr. at 257:16–258:1.) The woman said she would look into it and call him back. (Dkt. 176 ¶ 20.) Sabbagh received a voicemail message later that day from a woman identifying herself as "Tonia with Bluestone Environmental," who stated that she had "some pricing for you for the building in Chicago," and to call her back. (*Id.* ¶ 23.) It is undisputed that Tonia Williams works for Bluestone Environmental, and she identified her voice as the one on the voicemail left for Sabbagh. (Dkt. 176 ¶¶ 25, 30.) Sabbagh states that he called Tonia back that same day and was

---

also repeatedly object to Travelers' statements of fact by claiming Travelers has failed to comply with the requirements in the local rules that their statement consist of concise numbered paragraphs. The Court overrules this objection; while some of Traveler's statements do contain multiple assertions in the same paragraph, the same can be said of some of the Pittsfield Entities' statements of fact, as well as many of its responses to Travelers' statements. In any event, the Court does not find Travelers' statements so lacking in conciseness or so overly compound such that they violate the rules.

given the estimated quote of $950,000.00, which he then entered into the Xactimate program as the line item for lead paint and asbestos removal. (*Id.* ¶ 24.)

Travelers disputes Sabbagh's testimony about the Bluestone Environmental quote and contends that no such quote or estimate was ever given.[5] For support, Travelers points to deposition testimony and declarations from Bluestone Environmental employee Tonia Williams, as well as Bluestone Environmental's president and owner David O'Dea. Williams testified that, while it was her voice on the voicemail left for Sabbagh, she did not remember whether she spoke to Sabbagh on July 11, 2017, and does not know whether she gave him the "pricing information" referenced on the message. (Dkt. 184 ¶ 6) Williams separately testified that, while ballpark or rough estimates were occasionally given verbally, she had "not heard of" a verbal estimate ever being given for $950,000, and that the largest over the phone estimate she could recall was in the $20,000-$25,000 range. (Dkt. 184 ¶¶7–8; Dkt. 167 41.)[6] O'Dea similarly disputed that any employee of Bluestone would ever provide an oral quote or bid for $950,000 sight unseen, testifying instead that the largest oral quote would be around $25,000, and further that the largest project Bluestone had ever completed was less than $250,000. (Dkt. 167 ¶¶ 37–38.)

Apart from these factual disputes, it is undisputed that Bluestone has no written record of ever providing a quote, bid, or estimate, written or oral, for the Pittsfield Building. (*Id.* ¶ 36). It is

---

[5] Travelers separately objects that Sabbagh's testimony about what Williams said is inadmissible hearsay. As discussed *infra* at note 8, the Court need not separately resolve the hearsay issue because the Court concludes Travelers is entitled to summary judgment even if Sabbagh's testimony about what Williams said is admissible.

[6] Williams also submitted a declaration in which she goes as far as to affirmatively state that she has never communicated a $950,000 bid for asbestos abatement to any person. (Dkt.162-8 ¶ 6.) But this conclusive statement is inconsistent with her testimony that she does not remember speaking with Sabbagh one way or another, and regardless, is disputed by Sabbagh's testimony to the contrary that she did provide the quote. As discussed further in this opinion, this factual dispute is ultimately irrelevant however, as even accepting that the quote was given as the Pittsfield Entities contend, summary judgment in Travelers' favor is still warranted. The Pittsfield Entities separately object to the declarations from both Williams and O'Dea and ask the Court to strike certain portions of the declarations that the Pittsfield Entities claim are improperly based on "information and belief" and do not represent the witness's personal knowledge. (*See* Dkt. 181 at 13.) As with Travelers' hearsay objection, however, the Court need not resolve this issue because the Court finds summary judgment proper irrespective of Williams and O'Dea's declaration testimony. The Pittsfield Entities' motion to strike is therefore moot.

further undisputed that neither Sabbagh, nor anybody from the Pittsfield Entities, ever followed up with Bluestone Environmental, or any contractor for that matter, to have asbestos work performed or to come up with a written proposal for asbestos remediation work. (*See* Dkt. 182 ¶ 7.) For his part, Sabbagh agreed that the Bluestone Environmental quote was a "pretty loose and generalized estimate," as Bluestone Environmental had not yet seen the building and did not have any understanding of what asbestos materials might be present at the property, and he further explained that the estimate would not be accurate until Bluestone Environmental actually came out to the property to measure everything, test for asbestos, and give a full proposal or opinion of what work they thought needed to be done. (*See id.* ¶ 2; Dkt. 161-11 Sabbagh Dep Tr. at 261:7–25, 264:2–7.) When asked why he was confident enough in the $950,000.00 figure to include it in his report with overhead and profit, despite it being a rough estimate that needed further verification, Sabbagh stated that he listed it as "possibly a dollar amount that would have to be addressed in this claim if there's asbestos in the property." (Dkt. 167 ¶ 31) Sabbagh further stated that he could not speak to why the Pittsfield Entities, or their attorneys, decided to take that number and sue Travelers for it, claiming they were owed that figure. (Dkt. 161-11 Sabbagh Dep Tr. at 180:23–181:12.) Sabbagh also testified that, as a general matter, he did not view the ACV line-items in his report as "a representation that the amount is recoverable from the insurance company" but rather they were just "estimated number[s]." (Dkt. 167 ¶ 25; Dkt.161-11 Sabbagh Dep. Tr. at 165:3–166:19.) Finally, Sabbagh testified that, if the Pittsfield Entities had asked him whether to attach his estimate to their complaint to prove their damages, he would have told them to get a second opinion. (Dkt.161-11 Sabbagh Dep. Tr. at 182:17–25.)

After the completion of fact discovery, in light of the information learned from the above depositions and declarations, Travelers moved and was granted leave to file an amended answer

to assert a counterclaim, which they filed on June 22, 2020. (Dkt. 116.) In its counterclaim, Travelers asserts a claim for breach of contract, alleging that the Pittsfield Entities intentionally mispresented to Travelers that they were owed $1,140,000.00 in connection with the claim for water under the Policy based on what Travelers contends was a fictitious bid from Bluestone Environmental. (*Id.* ¶ 55.)

Apart from Danial and Sabbagh's testimony, the Bluestone Environmental bid item was also referenced in expert discovery later in the case. In January 2022, the Pittsfield Entities disclosed Stephen Harmon, an experienced contractor and insurance adjuster, as their Rule 26(a)(2) expert on damages. (Dkt. 167 ¶ 46.) Harmon prepared two reports in which he offered his opinions as to the ACV of the damages resulting from the water loss event in December 2016; his initial report identified the ACV as $8,714,262.26, and his subsequent report opined that the damages were $7,522,384.63, which was adjusted down based on adjustments to anticipated labor costs. (Dkt. 167 ¶ 51; Dkt. 124:25–) Harmon based his opinions on his review of Sabbagh's estimate, conversations with Sabbagh and Pittsfield, and his review of photographs and other documentary evidence of the damages. (Dkt. 184 ¶ 14; Dkt. 167 ¶ 50).

Notably, Harmon states in both of his reports that he "reviewed the estimate from the blue stone environmental services," adding that he cautioned whether the $950,000.00 "bid item" would cover the proper amount of renovations, due to "the times post Covid to get qualified workers to perform the renovations." (Dkt. 162-12 at 8; Dkt 162-13 at 3) Harmon's report, which was prepared using the same Xactimate system used by Sabbagh, goes on to include the same $950,000.00 "Bid Item from bluestone environmental" for lead paint and asbestos removal, though Harmon opined that the ACV would be even greater at $1,235,000 million, based on his own adjustments for overhead and profit. (Dkt. 162-12 at 96 Dkt 162-13 at 91). Although Harmon could not recall the

details of the bid item in his deposition, he reaffirmed that he "looked it over," and that, in his opinion, the Pittsfield Entities were owed $1,235,000 by Travelers for that line item. (Dkt. 167 ¶ 63.) Harmon went on to say that, if called to testify before a jury, he would testify that the Bluestone "bid" and his estimated ACV of $1,235,000 reflected "all the necessary asbestos remediation that would be required." (*Id.* ¶ 64.) Harmon further stated that he is not holding himself out as an expert on asbestos removal or abatement. (*Id.* ¶ 62.)

### Standard of Review

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Genuine issues of material fact are not demonstrated by the "mere existence of some alleged factual dispute between the parties," *id*. at 247, or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). Rather, "[t]he controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016).

The ordinary standards for summary judgment remain unchanged on cross-motions for summary judgment: the Court must "construe all facts and inferences arising from them in favor of the party against whom the motion under consideration is made." *Blow v. Bijora, Inc*., 855 F.3d 793, 797 (7th Cir. 2017). As always, however, the Court makes "only reasonable inferences, not every conceivable one." *Spitz v. Proven Winners N. Am*., *LLC*, 759 F.3d 724, 730 (7th Cir. 2014); *Nichols v. Mich. City Plant Plan. Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (the nonmovant "is not

entitled to the benefit of inferences that are supported by only speculation or conjecture."). Importantly, the mere "existence of cross-motions for summary judgment does not . . . imply that there are no genuine issues of material fact." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, Local Union 150, AFL-CIO*, 335 F.3d 643, 647 (7th Cir. 2003).

### Discussion

The parties have filed three cross-motions for summary judgment: Travelers has moved for summary judgment in its favor on its counterclaim and the Pittsfield Entities' claims, and the Pittsfield Entities have filed cross-motions for summary judgment in their favor on Travelers' counterclaim for breach of contract and on their own claim for reformation. While the parties raise a number of arguments across the three motions and nine associated briefs, the Court need only address the arguments with respect to Travelers' counterclaim in particular, as the Court's resolution of that claim is dispositive of all the claims in this lawsuit. In short, as detailed below, the Court concludes as a matter of law that the Pittsfield Entities made a material and intentional misrepresentation about the extent of their damages associated with their claim by repeatedly and falsely representing to Travelers that the Pittsfield Entities were owed more than $1 million for asbestos remediation. Under the terms of the Policy, this misrepresentation about the claim renders the Policy void. The Court thus finds that Travelers is entitled to judgment as a matter of law on its counterclaim for breach of contract, which necessitates judgment in its favor on both of the Pittsfield Entities' claims and return of all the money that Travelers paid out on the Policy.

### A. Applicable law

Travelers' counterclaim for breach of the insurance Policy is governed by the same general standards applicable to any claim for breach of contract under Illinois[7] law: Travelers must

---

[7] The parties agree that, as this case is before the Court on diversity jurisdiction, Illinois law controls.

demonstrate (1) the existence of a valid contract; (2) substantial performance by Travelers; (3) a breach by the Pittsfield Entities; and (4) damages. *See Gociman v. Loyola Univ. of Chicago*, 41 F.4th 873, 883 (7th Cir. 2022) (citing *Babbitt Muns., Inc. v. Health Care Serv. Corp*., 64 N.E.3d 1178, 1186 (Ill. App. Ct. 2016)). The only element at issue with respect to Travelers' counterclaim is whether there was a breach; Travelers claims that the Pittsfield Entities breached the "Concealment, Misrepresentation, or Fraud" provision of the Policy by making an intentional misrepresentation about their claim, specifically their amount of damages.

Illinois state and federal courts have consistently found similar concealment and fraud provisions in insurance contracts valid and enforceable. *See Metro. Cas. Ins. Co. v. Goriola*, No. 311-CV-00745, 2013 WL 6501705, at *3 (S.D. Ill. Dec. 11, 2013) (citing *Trzcinski v. American Cas. Co*., 953 F.2d 307, 313 (7th Cir.1992) (collecting cases)); *see also Barth v. State Farm Fire & Cas. Co.*, 886 N.E.2d 976, 981 (Ill. 2008). Under these contractual provisions, "when an insured willfully makes false statements in proofs of loss with intent to deceive the insurer, the insured cannot recover any amount." *Trzcinski*, 953 F.2d 307, 313 (citing *Tenore v. Am. & Foreign Ins. Co. of N. Y*., 256 F.2d 791, 795 (7th Cir. 1958)).

Notably, unlike in cases involving common law fraud, the insurer need not have actually relied on the misrepresentation in order for it to be considered material. *See Metro. Cas. Ins. Co*, 2013 WL 6501705, at *3 (citations omitted); *see also Z George Mgmt. Corp., Inc. v. Indian Harbor Ins. Co.*, 2018 IL App (1st) 152438-U, ¶ 29, 2018 WL 2601039, at *5 (Ill. App. 1 Dist., 2018) (noting that, in the insurance law context, the phrase "intentional misrepresentation of material fact" does not "incorporate the elements of common-law fraud and does not require a showing of such things as reliance or prejudice') (citing *Barth*, 886 N.E.2d at 981). Instead, all that matters is whether the misrepresentation was "'calculated to discourage, mislead or deflect' the insurer's

investigation on a topic on which a reasonable insurer 'would undeniably attach importance.'" *See Z George Mgmt. Corp., Inc. v. Indian Harbor Ins. Co.*, 2018 IL App (1st) 152438-U, ¶ 29, 2018 WL 2601039, at *5 (Ill. App. Ct. May 31, 2018) (quoting *Passero v. Allstate Ins. Co.*, 554 N.E.2d 384, 388 (Ill. App. Ct. 1990)).

Under Illinois law, the existence of fraud or false swearing is ordinarily a question of fact for the jury, but "it becomes a question of law when the insured's misrepresentations cannot be seen as innocent." *Lykos v. Am. Home Ins. Co.*, 609 F.2d 314, 315 (7th Cir. 1979) (quoting *Folk v. National Ben Franklin Insurance Co.*, 359 N.E.2d 1056, 1057 (1976)). An intent to deceive can be inferred from the fact that a person made a statement knowing it to be false for the purpose of inducing another to act. *See Trzcinski*, 953 F.2d at 313 (citation omitted). But the intent to deceive should not be "presumed" from the mere fact that a statement turned out to be false, and courts should "make all reasonable allowance for lack of knowledge or sound judgment or for honest mistake on the part of the insured as well as for the tendency to believe that which is to one's own interest." *Id.* (citation omitted). "Accordingly, courts have inferred fraudulent intent as a matter of law only where viewing the evidence in the light most favorable to the insured, the court determines that any reasonable jury would find that the insured knowingly made false statements or willfully sought to defraud the insurer by misrepresentation." *Id.*

### B. Whether the Pittsfield Entities Intentionally Mispresented Their Damages

Travelers argues that the Pittsfield Entities made a material misrepresentation to Travelers by representing that they had a "Bid Item" from Bluestone Environmental in the amount of $950,000.00 for asbestos removal as a result of the water damage event, and by claiming that they were owed $1,140,000.00 as part of their damages based on that "Bid Item." As discussed above, Travelers disputes Sabbagh's claim that he received an oral bid for $950,000.00 from Bluestone at

all, pointing to the testimony from Williams and O'Dea that there was no record of any proposal for the Pittsfield Building, that the largest project Bluestone Environmental had ever done was for $250,000.00, and that Bluestone Environmental had never provided an oral quote for work, sight unseen, in excess of $25,000.00. Travelers further argues that, even if Sabbagh did receive such an oral quote from Williams at Bluestone Environmental, it was not an actual bid or proposal for work, but was, at most, a "loose and generalized" estimate for work that could "possibly" be needed to be addressed "if" there was asbestos in the property. Travelers contends that it was simply a lie for the Pittsfield Entities to take this estimated and generalized number for hypothetical work and claim it as "proof" that they were entitled to $1,140,000.00 in damages for asbestos removal, when there is no evidence that asbestos removal was required at all as a result of the water damage, let alone that it was required for the entire approximate square footage Sabbagh provided over the phone. Travelers thus argues that the Pittsfield Entities misrepresented the extent of their damages by $1,140,000.00, which makes up more than 13% of their total claimed damages of $8.5 million, thus violating the Policy and rendering it void.

The Pittsfield Entities argue, on the other hand, that the testimony and evidence from Bluestone Environmental does not refute Sabbagh's testimony that he received an oral quote for $950,000.00 for asbestos removal, because Williams separately testified that she did not remember speaking with Sabbagh one way or another and did not know whether she provided any oral pricing information. According to the Pittsfield Entities then, Williams and O'Dea's testimony about whether they believed, as a general matter, that Bluestone had ever provided a $950,000.00 quote does nothing to dispute Sabbagh's testimony that the quote was actually made, because neither witness has any first-hand knowledge or recollection of the phone call to refute Sabbagh's testimony, which is also corroborated by the voicemail from Williams stating that she had "pricing

information." The Pittsfield Entities thus argue that it is undisputed that Sabbagh did in fact receive

an oral bid for $950,000.00 for asbestos removal, and that there was therefore no misrepresentation

or fraud in the Pittsfield Entities including that quote in their estimates submitted to Travelers. The

Pittsfield Entities separately argue that Travelers waived the right to claim fraud or

misrepresentation, because they had the Sabbagh estimate in July 2017, and did not raise the issue

of fraud or misrepresentation until they filed their counterclaim in June 2020, nearly three years

later.

The Court concludes that the Pittsfield Entities did in fact make an intentional and material

misrepresentation as a matter of law. While the Pittsfield Entities focus on the factual dispute over

whether Sabbagh actually received an oral quote from Williams for $950,000.00, they completely

ignore the bigger issue raised by Travelers: whether it was nonetheless a misrepresentation for

them to take that estimate and present to Travelers as factual proof of damages to which they were

entitled under the Policy. The Court concludes that it was. As explained below, even assuming

there was an oral quote for $950,000.00 for asbestos removal as Sabbagh testified (coming to

$1,140,000.00 with overhead and profit), Sabbagh's other testimony about the circumstances of

the quote, and its highly generalized and hypothetical nature, reveals that the Pittsfield Entities had

no basis to claim it as damages. In short, the Pittsfield Entities' repeated reliance on that figure as

part of their overall damages was a material misrepresentation about their claim.[8]

As discussed above in the background section, Sabbagh received the oral quote by simply

providing Bluestone Environmental with the age of the Pittsfield Building and the approximate

---

[8] Based on the Court's resolution of this issue, it need not separately determine whether Sabbagh's testimony about what Williams said on the phone is inadmissible hearsay and should be stricken, because Sabbagh's testimony about the nature of the quote supports summary judgment in Travelers' favor, regardless of whether what Williams said is inadmissible. The Court will thus assume, without deciding, that the testimony is admissible. The Court also need not resolve the Pittsfield Entities' separate argument that Williams's and O'Dea's affidavits are inadmissible and should be stricken. Again, Sabbagh's testimony about the quote supports summary judgment in Travelers' favor regardless of whether the Court accepts Williams and O'Dea's testimony that the quote was never given.

square footage of the floors of the Pittsfield Building affected by the water damage. Even assuming that it is true that Bluestone Environmental, with this limited and approximate information, provided a rough estimate of $950,000, Bluestone Environmental was not representing that it would actually do asbestos remediation work at the Pittsfield Building for that figure. Rather, as Sabbagh testified, the quote was nothing more than a "loose and generalized estimate" that reflected "possibly a dollar amount that would have to be addressed in this claim *if* there's asbestos in the property." (*See* Dkt. 167 ¶ 31; Dkt. 187 ¶ 2; Dkt. 161-11 Sabbagh Dep Tr. at 261:7–25, 264:2–7, 264:24–265:5 (emphasis added).) As Sabbagh noted, Bluestone Environmental did not have any understanding of what asbestos materials were actually at the building, and therefore any estimate would not be accurate until they actually came out to the property to test and measure, so that they could prepare "a full proposal or opinion of what they think would have to get done." (Dkt. 161-11 Sabbagh Dep Tr. at 261:7–14, 264:2–7.) But neither Bluestone, Sabbagh, or any other contractor for that matter, ever examined the property to confirm that asbestos removal was actually needed at the Pittsfield Entities as a result of the water loss, let alone whether it was needed for the entire square footage Sabbagh provided over the phone.

In short then, the $950,000 oral estimate from Bluestone Environmental was not an actual bid or proposal for work that needed to be done in connection with the water loss event. The terms "bid" or "proposal," as commonly understood, imply an actual offer to do work for a certain price.[9] The figure here was not an offer to do work for a price, but was purely hypothetical; it was a loose estimate of a top-line *potential* dollar figure that *might* be implicated *if* work needed to be done at all over the entire square footage, and Sabbagh himself stated any quote would need to be verified

---

[9] *See* Bid, Merriam-Webster Dictionary ("to offer (a price) whether for payment or acceptance"), available at https://www.merriam-webster.com/dictionary/bid (last accessed June 14, 2024); Proposal, Merriam-Webster Dictionary ("an act of putting forward or stating something for consideration . . .[an] offer.") available at. https://www.merriam-webster.com/dictionary/proposal (last accessed June 14, 2024).

through an actual inspection. In other words, this hypothetical and generalized estimate did not constitute a bid or proposal for work that actually needed to be done—rather the bid or proposal for work would only happen after Bluestone Environmental or another contractor actually came to the property and confirmed what asbestos remediation, if any, was actually needed and for what area, and determined a quote based on that work. But this never happened.

Yet despite all of Sabbagh's qualifications and caveats with respect to this oral estimate, and the fact that it was not an actual proposal for work that needed to be done, the Pittsfield Entities took this generalized and hypothetical figure and presented it to Travelers as one of fact. That is, the Pittsfield Entities presented this figure as proof that they were entitled to $1,140,000 in damages under the Policy for asbestos abatement. The Pittsfield Entities cited Sabbagh's estimate in their pleadings and used the $1,140,000.00 figure as part of their purported $8,592,961.40 damages. The Pittsfield Entities then reiterated, in the Rule 30(b)(6) deposition of Danial, that they were entitled to payment of that $1,140,000.00 figure under the Policy as part of their damages. Critically, when asked for their "proof" of that figure, the Pittsfield Entities claimed that they "have a proposal from a contractor that says it." (Dkt. 167 ¶ 30; Dkt 161-6, Danial Dep. Tr. at 201:12– 25.)

But Danial's statement that the Pittsfield Entities "had a proposal" substantiating that they were owed $1,140,000 is simply false. Sabbagh's line item in his estimate is not itself a proposal, and as discussed above, there was no actual bid for $950,000.00 in asbestos removal, but rather nothing more than a hypothetical and general approximation based on the square footage of the building. In other words, there was no "proposal" that said the Pittsfield Entities would need to spend $1,140,000.00 in asbestos removal as a result of the water damage. The Pittsfield Entities

20

thus misrepresented their damages by boldly and repeatedly asserting that they were entitled to $1,140,000 under the Policy for asbestos removal.

And the Pittsfield Entities' use of this illusory figure to misrepresent their damages did not stop there. Almost two years after Sabbagh testified that the purported "bid" from Bluestone Environmental was nothing more than a generalized estimate that needed further verification, the Pittsfield Entities doubled down on their claim they were owed that amount as part of their claim by including it as part of expert Harmon's damages analysis disclosed in January 2022. As noted above, Harmon claimed across both of his reports that he "reviewed the estimate" from Bluestone Environmental services, and he reaffirmed this claim in his February 2022 deposition testimony saying that he "looked it over." (*See* Dkt. 162-12 at 8; Dkt 162-13 at 3; Dkt. 167 ¶ 63; Dkt. 162-14 Harmon Dep. Tr. at 273:9–12.) Harmon went on to assert that, in his opinion, the Pittsfield Entities were owed $1,235,000 in damages from Travelers based on the Bluestone line item, going as far to say that he would testify to the jury that the $1,235,000 ACV figure reflected "all the necessary asbestos remediation that would be required." (Dkt. 167 ¶¶ 63–64; Dkt. 162-14 Harmon Dep. Tr. at 274:3–275:5.)

Harmon's statements are deeply misleading. The obvious implication from the contention that he "reviewed the estimate" is that there was some written estimate or proposal for asbestos removal work to review. But there was not, because the estimate, if given at all, was given orally. The only thing that Harmon could have possibly "reviewed" or "looked over" was the line-item on Sabbagh's estimate that stated in conclusory fashion that there was a "Bid Item" for $950,000.00. But again, that line item was not itself a proposal for work that needed to be done— and it was never verified by an actual inspection. Despite this, Harmon took the figure, added overhead and profit for an estimated $1,235,000.00, and claimed in conclusory fashion that the

Pittsfield Entities were owed that amount, and that he would testify it accurately reflected the necessary asbestos remediation. But this testimony that the figure reflects necessary work is simply false; there is no evidence that the Pittsfield Entities required anything approaching $1,235,000.00 for necessary asbestos removal as, again, no contractor ever verified what work was required. Further, Harmon stated he was not an expert in asbestos remediation or abatement, and there is no evidence he conducted an independent review of the property. Harmon therefore had no independent grounds to opine on how much asbestos work might be required. Harmon's statements on behalf of the Pittsfield Entities that they required asbestos abatement work in excess of $1 million dollars is therefore not only baseless but continued the misrepresentation of the Pittsfield Entities' damages.

The Pittsfield Entities' briefing is notably silent on all the above issues. They do not explain Harmon's testimony about looking over a non-existent bid, nor address the inconsistency between Danial's claims that they "have a proposal that says" $950,000.00.00 in asbestos work is required and Sabbagh's testimony that the supposed "proposal" was a loose and generalized quote that would need to be verified through testing. Nor do the Pittsfield Entities make any attempt to come forward with independent evidence that asbestos remediation was actually required, let alone that it would be required for the entire square footage that formed the basis of the $950,000.00 estimate. Quite the contrary, the Pittsfield Entities simply deny they have said anything false, and instead repeatedly assert that they did in fact receive an oral bid for $950,000.00 for asbestos work, and that the sum of $1,140,000 (with overhead and profit) for that work is "due and payable by Travelers." (*See, e.g.*, Dkt. 167 ¶¶ 27 28, 32) The Pittsfield Entities go so far as to suggest at one point that it was Travelers' burden to come forward with evidence showing that such work was *not* required, stating that "[t]here is noting in the record to reflect that there was no need for asbestos

remediation." (Dkt. 182 ¶ 7.) But it is not Travelers' responsibility to establish that there was *no* need for asbestos abatement at all. The question is not whether some asbestos abatement might be needed or required. The question is whether the Pittsfield Entities were being truthful when they claimed, repeatedly, that they were specifically owed $1,140,000 for asbestos remediation. They were not; they did not have a proposal saying that over $1 million in asbestos remediation was required, and it is frankly remarkable for the Pittsfield Entities to maintain, through the instant summary judgment briefing, that they are entitled to over $1 million in damages under the Policy for asbestos abatement when there is absolutely no evidence suggesting that that figure ever accurately reflected work that needed to be done. No contractor or expert in asbestos abatement will ever testify that asbestos work was required and that it would cost over $1 million dollars. And of course, no asbestos work will ever be done at the Pittsfield Entities' expense, because they have sold their interest in the building.

In sum, the Court finds the Pittsfield Entities misrepresented their damages by claiming they were owed $1,140,000.00 under the Policy for asbestos abatement as a result of the water loss event in December 2016. As noted above, an insured that willfully makes false statements about their loss with the intent to deceive the insurer is not entitled to recover any amount under their policy. *Trzcinski*, 953 F.2d at 313. While the existence of such fraud is usually a question of fact for a jury, it becomes a question of law "when the insured's misrepresentations cannot be seen as innocent." *Lykos*, 609 F.2d at 315. And here, even drawing all reasonable inferences in the Pittsfield Entities' favor allowing for the possibility of innocent mistake, the Court concludes, based on all the record evidence, that no reasonable jury could view the Pittsfield Entities' statements as innocent.

23

This is not a case involving a simple discrepancy in damages estimates, or a good faith disagreement over some work item purportedly associated with an insurance claim. The Pittsfield Entities here simply had no basis to cite the Bluestone Environmental "quote" as proof that they were entitled to payment of over $1 million for asbestos removal based on the water damage. As discussed at length above, the estimate that was actually received from Bluestone Environmental was completely hypothetical and bore no relation to any work that actually needed to be done. Indeed, Sabbagh specifically testified that he did not view the ACV line items in his estimate, including the quote from Bluestone Environmental, as representations of amounts that were actually recoverable from Travelers, but rather saw them as pure estimates needing verification, and he expressly stated that if the Pittsfield Entities had asked him whether to use his estimates as proof of their damages, he would have told them to first get a second opinion. (Dkt. 167 ¶ 25; Dkt.161-11 Sabbagh Dep. Tr. at 165:3–166:19, 182:17–25). But, of course, they did not, and instead took the number and presented it to Travelers as proof of something they were owed, a claim they then repeated throughout this lawsuit over the course of several years, going so far as to have their expert witness testify that the "bid" accurately reflected the work that was necessary for asbestos remediation.

The only conclusion that can be drawn from the Pittsfield Entities' repeated presentation of this hypothetical quote as proof of their damages, despite the fact that it had no factual connection to work that actually had to be done, is that the Pittsfield Entities submitted that false number with the intent of deceiving or misleading Travelers into paying that amount. Put another way, no jury could conclude that the Pittsfield Entities committed an honest mistake by claiming they had a bid from a contractor providing they were owed $1,140,000 for asbestos removal, when all they had was an illusory estimate that they never bothered to verify.

The Court acknowledges, as another district court in this circuit has observed, it is somewhat unusual to resolve the issue of whether a party made an intentional misrepresentation at the summary judgment phase. *See Metro. Cas. Ins. Co. v. Goriola*, 2013 WL 6501705, at *4. But several Illinois state and federal courts have entered judgment in an insurer's favor under similar circumstances where the insured grossly inflated their damages to the extent that there was no way their conduct could reasonably be considered innocent. *See id.* (entering summary judgment for defendant-insurer where insured-plaintiff "grossly overstated" the amount of her damages by misrepresenting the value of her home and personal property damaged in a fire); *Passero*, 554 N.E.2d at 386 (affirming summary judgment for insurer where insured submitted false receipts as part of a claim for stolen property)*; Lykos*, 609 F.2d at 316 (affirming district court's grant of judgment notwithstanding the verdict for insurer, where the evidence demonstrated the insured engaged in a pattern of overstating the value and quantity of items purportedly damaged in  a building fire). Here, as in the above cases, the Court concludes judgment in Travelers' favor is appropriate because the Pittsfield Entities' misrepresentations about its damages can in no way be seen as innocent, and "no reasonable jury could find otherwise."  *Lykos*, 609 F.2d at 316.

All that leaves is the Pittsfield Entities' argument that Travelers has waived its right to claim the Policy is void by waiting until June 2020, almost three years after Sabbagh prepared his estimate, to raise the argument. But as Travelers points out in its briefing, it was not until discovery in this case that Travelers uncovered the facts giving rise their claim; it took written discovery to reveal that there was no written bid or proposal underlying the supposed Bluestone Environmental bid, and it was only through their depositions of Sabbagh and Danial in February 2020 that Travelers truly uncovered that there had been a misrepresentation. Travelers promptly amended its answer to bring the counterclaim just a few months later in June 2020. Therefore, while it is true

that an insurer can waive a claim that a policy has been rendered void through delay, the Court finds no such delay here.

In sum, Travelers is entitled to judgment as a matter of law on its counterclaim for breach of contract. The Pittsfield Entities breached the Policy by making a misrepresentation about their claim, rendering the Policy void. Travelers is entitled to return of the $301,537.95 it paid out on the claim, plus interest and costs. While this may seem like an extreme result, the Seventh Circuit has previously observed that district courts must not hesitate to enforce such misrepresentation provisions in insurance policies in an effort to deter insureds from defrauding insurers through the making of false statements about their claim:

> [T]he insured, if he suffers a loss, must honestly state, under oath, the extent of his loss and give this information to the insurer. He must not make false proofs of loss with intent to defraud the insurer. Although the penalty is heavy and seemingly harsh, it is one way of stopping the presentation of false, fictitious or inflated claims. False and exaggerated claims seemingly go hand in hand with incendiarism. The court should therefore unhesitatingly act to prevent attempted frauds on the part of the insured.

*Lykos*, 609 F.2d at 316 (citing *Tenore*, 256 F2.d at 794.) Here, Travelers has met its burden to establish, as a matter of law, that the Pittsfield Entities made a material misrepresentation about their claim. Judgment in its favor is therefore appropriate.

## C. Judgment in Travelers' Favor Necessitates Dismissal of the Pittsfield Entities claims.

As the Court is entering judgment in Travelers' favor on its breach of contract claim, this necessitates judgment in its favor on the Pittsfield Entities' breach of contract claim and claim for reformation as well. As the Pittsfield Entities' misrepresentation renders the Policy void, they are not entitled to recovery of *any* funds under the Policy, let alone the $8.5 million claimed in Count I of their SAC. Further, the sole purpose of the reformation claim in Count II of the SAC is to reform the Policy to add the Pittsfield Hotel entity to the Policy, so that it too may pursue a claim

for breach of contract. This claim is rendered moot given that the Policy is void, and none of the Pittsfield Entities can pursue a claim for breach of contract. Judgment is therefore entered in Travelers' favor on both of the Pittsfield Entities' claims.

## Conclusion

For the forgoing reasons, Travelers' motion for summary judgment (Dkt. 160) is granted, and judgment is entered in Travelers' favor for $301,537.95, plus interest and costs. The Pittsfield Entities' motions for summary judgment (Dkt. 151; Dkt 156) are both denied.

ENTERED: 7/3/24

_Nancy L. Maldonado_

Nancy L. Maldonado

United States District Court Judge